(No. 49486. 

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. SETH GRANT, Appellee.

*Opinion filed May 26, 1978.*

KLUCZYNSKI, J., took no part.

William J. Scott, Attorney General, of Springfield, and Roger W. Thompson, State's Attorney, of Lincoln (Donald B. Mackay, and Melbourne Noel, Assistant Attorneys General, of Chicago, and Robert C. Perry, of the Illinois State's Attorneys Association Prosecutor's Appellate Service, of Springfield, of counsel), for the People.

Richard J. Wilson, Deputy Defender, of Springfield (Barbara A. Chasnoff, Assistant Defender, of counsel), for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

After a jury trial in the circuit court of Logan County, the defendant, Seth Grant, was convicted of aggravated battery and obstructing a police officer. The court entered judgment on both verdicts, but sentenced the defendant to 3 to 9 years of imprisonment only for the offense of aggravated battery. A divided appellate court reversed the convictions and remanded the cause for a new trial so that the jury could be instructed on both an insanity defense and on the defense of involuntary conduct. (46 Ill. App. 3d 125, 131.) We granted the State leave to appeal.

The evidence adduced at trial indicated that the defendant is an epileptic who is susceptible to both grand mal and psychomotor seizures. It was also established that during the 2½ hours prior to the incident which precipitated defendant's arrest, defendant had four mixed drinks at a tavern. A fight erupted at the tavern, and the police officer who arrived to quell the fight was struck by the defendant.

The defendant was arrested and transported to the

city jail. There, within the hour, he was discovered lying on a cell cot, gasping for breath and convulsing in a manner symptomatic of a grand mal seizure. He was immediately rushed to a Lincoln hospital, and, later that night, was taken to a Springfield hospital. The following morning, defendant was examined and interviewed by a physician specializing in psychiatry. The physician's diagnosis at that time was that the defendant suffers from acute alcoholism and epilepsy. The physician, called by defendant, testified that, in his opinion, the defendant was experiencing a psychomotor seizure at the time he struck the police officer, and that defendant lacked the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

The physician provided the only expert testimony on epilepsy. He characterized a grand mal seizure as the form most commonly associated with epilepsy, one in which the epileptic becomes unconscious and may chew his tongue and lose control of his excretory functions. The psychomotor seizure, he testified, is less obvious to the lay observer. An epileptic lapsing into a psychomotor seizure may be completely mobile and may converse, although with reduced coherence. He noted, however, that a psychomotor seizure is similar to a grand mal seizure in that it is a trance-like state during which the epileptic is unaware of what he is doing or what he has done and is incapable of controlling his actions. Although alcohol, as well as excitement and hyperventilation, may precipitate a psychomotor seizure, the furor of a seizure, once commenced, is independent of the intoxication. A psychomotor seizure can last for seconds or minutes and often precedes a grand mal seizure.

The State, in an effort to convince the jury that the defendant was not in the throes of an epileptic seizure at the time he struck the officer, elicited testimony to show that the defendant's actions, both during and after the

tavern incident, belied the symptoms typical of psychomotor seizures, that the defendant's actions were more likely precipitated by his alcohol consumption and his propensity toward antisocial behavior, and that the defendant may have simulated symptoms in order to deceive the doctor and escape criminal responsibility for his actions. The record reflects that the defendant has a complicated medical and legal history. At the time of the tavern incident, the defendant was taking medication to control both his epileptic condition and his nervousness. The physician, on direct examination, testified that defendant's case history included a number of violent attacks on other persons: on one occasion, the defendant had assaulted a nurse with a knife; on another, while in a drunken state, he shot a man. He stated that defendant had been jailed numerous times for drunkenness and fighting.

At the conference on instructions, both the State and the defendant tendered jury instructions regarding the defense of insanity. The trial court chose to tender the State's instruction, taken from Illinois Pattern Jury Instruction, Criminal, No. 24.01 (1968), which reads:

> "A person is insane and not criminally responsible for his conduct if at the time of the conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
>
> Abnormality manifested only by repeated criminal, or otherwise anti-social conduct, is not mental disease or mental defect." (IPI, Criminal No. 24.01 (1968).)

The defendant objected only to the second paragraph. The defendant also objected to the verdict forms which instructed the jury that if it concluded that defendant was not guilty by reason of insanity, it must find further either that he was still insane or that he had recovered from his condition of insanity. (See Ill. Rev. Stat. 1973, ch. 38, par.

115—4(j).) The defendant tendered no instruction on any theory other than insanity.

In the appellate court, the defendant urged, generally, that the insanity instruction and verdict forms, considered together, confused the jury and misstated the law. More specifically, the defendant argued that it was unclear whether the condition of epilepsy or the epileptic seizure was the "mental disease or mental defect" referred to in the insanity instruction. The defendant asserted that the verdict forms aggravated the confusion in that the defendant might be considered recovered from the seizure, but still insane with respect to his epileptic condition. The divided appellate court, in reversing the conviction, did not conclude that the insanity instruction and verdict forms confused the jury. Instead, it held that the failure of the trial court to *sua sponte* instruct the jury on the defense of involuntary conduct was a substantial defect requiring the reversal of defendant's conviction. We note that the defendant did not try the case on an involuntary conduct defense, did not cite in his post-trial motion the failure to instruct the jury on such a defense, and did not argue in the appellate court that such instruction should have been given.

We emphasize that, under Illinois law, the burden of preparing jury instructions, in criminal as well as in civil cases, is primarily on the parties, not on the trial court. (58 Ill. 2d R. 451; Ill. Rev. Stat. 1973, ch. 110, par. 67.) We have repeatedly pronounced that, with certain exceptions, the trial court is under no obligation to give jury instructions not requested by counsel. (*People v. Springs* (1972), 51 Ill. 2d 418, 425; *People v. Damen* (1963), 28 Ill. 2d 464, 469.) This is particularly true when the evidence adduced at trial is amenable to alternative theories. It is not enough merely to introduce relevant evidence. If a defendant does not articulate his theory in argument, and fails to tender jury instructions identifying

it, he cannot reasonably expect the trial court, unaided, to divine his intent. The record in this case reveals, quite unmistakably, that the defendant proceeded at trial and on appeal solely on the theory of insanity. His objections, limited to the second paragraph of the insanity instruction and to the verdict forms, in no way preserved his right to object that an instruction on the defense of involuntary conduct was not given. Therefore, unless the omission of an instruction on involuntary conduct constituted such a substantial defect that the failure of the trial court to *sua sponte* give it resulted in an unfair trial, such omission shall be disregarded on appeal. 58 Ill. 2d R. 615(a).

To appreciate precisely the defect to which the defendant refers, we must examine the kindred relationship between the defense of involuntary conduct and the insanity defense, as they apply to an epileptic seizure.

Both defenses adhere to the fundamental principle that a person is not criminally responsible for an involuntary act. Certain involuntary acts, *i.e.*, those committed during a state of automatism, occur as bodily movements which are not controlled by the conscious mind. A person in a state of automatism lacks the volition to control or prevent the involuntary acts. Such involuntary acts may include those committed during convulsions, sleep, unconsciousness, hypnosis or seizures. (See Ill. Ann. Stat., ch. 38, par. 4—1, Committee Comments, at 250 (Smith-Hurd 1972), citing Model Penal Code, sec. 2.01 and Comment 3, at 121 (Tent. Draft No. 4 (1955).) A cornerstone of the defense of involuntary conduct is that a person, in a state of automatism, who lacks the volition to control or prevent his conduct, cannot be criminally responsible for such involuntary acts. Similarly, the insanity defense exculpates a person whose volition is so impaired during a state of automatism that he is substantially incapable of conforming his conduct to the law. To that extent, the defense of involuntary conduct and the

insanity defense are alternative theories at the disposal of a defendant whose volition to control or prevent his conduct is at issue. See Weinberg, *Epilepsy and the Alternatives for a Criminal Defense,* 27 Case W. Res. L. Rev. 771, 787-803 (1977); Model Penal Code sec. 2.01(2), Comment 3, at 121 (Tent. Draft No. 4 (1955); W. LaFave & A. Scott, Criminal Law sec. 44, at 337-41 (1972).

The defendant here, for the first time, contends that the jury could not have properly determined that the defendant possessed the requisite volition for criminal responsibility without having been informed of the defense of involuntary conduct through the IPI instruction that "A material element of every crime is a voluntary act \*\*\*." (IPI Criminal No. 4.14 (1968).) The insanity instruction, as tendered, informed the jury that a person is not criminally responsible for his conduct if, at the time of the conduct, as a result of a mental disease or defect, he lacked either the requisite volition or the requisite cognition. Whether the defendant's epileptic seizure could be characterized as a mental disease or defect for the purposes of the insanity defense was never at issue. The only issue was whether the defendant was in fact in the throes of an epileptic seizure which substantially impaired his volitional capacity at the time of the conduct. The record clearly reflects that the insanity instruction and the summations drew the jury's attention fully to the evidence regarding the defendant's volition to control or prevent his conduct. Instructing the jury that "a material element of every crime is a voluntary act" would not have framed the evidence more plainly. By finding that the defendant, at the time of the conduct, was sane beyond a reasonable doubt, the jury rejected the evidence which would have supported the need for an instruction on the defense of involuntary conduct. We find that the failure to *sua sponte* instruct the jury on the defense of involuntary conduct did not deprive the defendant of full and fair consideration on

the issue of his volitional capacity to control or prevent his conduct. Accordingly, we hold that the omission of such instruction was not so substantial under the circumstances as to require a reversal of the conviction.

The defendant reasserts in this court that the insanity instruction and verdict forms, considered together, confused the jury. His contention—that it was unclear whether the condition of epilepsy or the epileptic seizure was the mental disease or defect referred to in the insanity instruction—is manifestly belied by the record. The expert witness opined that, at the time of the offense, the defendant suffered from epilepsy and acute alcoholism, and he characterized both as mental diseases or defects. Defense counsel, during his summation, repeatedly represented that a person suffering from a mental defect such as epilepsy may become incompetent at the time he experiences a seizure. The verdict forms which, the defendant asserts, aggravated the confusion were to be considered by the jury only in the event of a verdict of not guilty by reason of insanity. In light of the fact that the jury returned a verdict of guilty, thereby rejecting the insanity defense, we do not believe that such verdict forms confused the jury or in any way prejudiced the defendant.

For the reasons stated, we reverse the judgment of the appellate court wherein the case was to be remanded for a new trial.

Defendant raises a final point which pertains to his sentence. Subsequent to the rendering of the appellate court's opinion, the legislature approved a new comprehensive sentencing act. The amendatory act provides that the sentence of imprisonment for aggravated battery, a Class 3 felony (Ill. Rev. Stat. 1977, ch. 38, par. 12—4(d)), shall be a determinate sentence of not less than 2 nor more than 5 years (Ill. Rev. Stat., 1977 Supp., ch. 38, par. 1005—8—1(a)(6)). The defendant was sentenced to an indeterminate term on April 29, 1975, of 3 to 9 years'

imprisonment. The amendatory act expressly provides:

"Prosecution for any violation of law occurring before the effective date of this amendatory Act of 1977 is not affected or abated by this amendatory Act of 1977. If the defendant has not been sentenced before the effective date of this amendatory Act of 1977, he shall have the right to elect to be sentenced under the law as it existed at the time of his offense or under the law in effect on and after the effective date of this amendatory Act of 1977. *If a sentence has been imposed before the effective date of this amendatory Act of 1977, the defendant shall not have the right of election even though his case has not been finally adjudicated on appeal*; however, where eligible, he shall have the rights provided by Section 3—3—2.1 of this Code." (Emphasis added.) (Ill. Rev. Stat., 1977 Supp., ch. 38, par. 1008—2—4(b).)

The effective date of the new sentencing act was February 1, 1978.

The defendant seeks to be allowed to elect sentencing under the new act and asserts that section 8—2—4(b) of that act violates the equal protection clauses of the State and Federal constitutions. He argues that there is no rational basis for distinguishing between persons sentenced after the effective date of the act and those, sentenced prior to that date, whose appeals are still pending.

We do not agree. Without a doubt, the power of the legislature to determine punishment is subject to constitutional limitations. Nevertheless, the ability to elect to be sentenced under a law enacted after the date of the commission of a crime is not a constitutional right but a benefit conferred solely by statute. It is not unconstitutional for the legislature to confer such benefit only prospectively, neither is it unconstitutional for the legislature to specify "a classification between groups differently situated, so long as a reasonable basis for the distinction exists." (*People v. Spears* (1971), 50 Ill. 2d 14, 16.) In this instance, the legislature distinguished between those defendants, on the one hand, who had not yet been

accorded any sentencing hearings prior to the cut-off date, and those, on the other hand, whose sentences, already imposed, would require remandments for additional sentencing hearings. We find this to be a reasonable basis for distinction and, therefore, no constitutional denial of equal protection.

The two cases cited by the defendant do not undermine this conclusion. In *People ex rel. Carroll v. Frye* (1966), 35 Ill. 2d 604, this court considered whether a statutory amendment which provided credit for the time served in jail while awaiting trial must be applied retroactively to the effective date of the amendment. The State asserted that the rational basis for limiting the retroactive application of the amendment was to prevent double credit, in that the judge may have accounted for said time when fixing sentence. The court rejected the State's position only as it applied to offenses which carried mandatory minimum sentences and reasoned that in such instances, it was unlikely that the judge actually compensated for time served. Therefore, the court concluded, no basis remained for distinguishing among defendants whose offenses carried mandatory minimum sentences.

In *People v. Nicks* (1976), 62 Ill. 2d 350, this court reviewed an ameliorative law regarding consecutive sentences. The new law provided that it was to apply only to persons sentenced to consecutive terms after the effective date of the law. At that time, the Unified Code of Corrections provided that those sentenced prior to the effective date of a new sentencing law were entitled to benefit from any ameliorative changes in that law if their case had not yet reached "final adjudication." The court held that no rational basis existed for denying to those sentenced to consecutive terms a benefit which would have been accorded to those sentenced to nonconsecutive terms.

Accordingly, we hold that defendant is not entitled to

elect to be sentenced under the provisions of the new sentencing act.

The judgment of the appellate court is reversed. The trial court's judgment of conviction for aggravated battery and the sentence thereon is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

MR. JUSTICE KLUCZYNSKI took no part in the consideration or decision of this case.