THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLOBY GAINES, Defendant-Appellant.

First District (1st Division)    No. 80-155

Opinion filed February 2, 1981.

Gordon Berry, of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Pamela L. Gray, and Gael McCaughey-O'Brien, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

This is an appeal from the circuit court of Cook County, wherein the defendant, Willoby Gaines, was convicted, in a bench trial, for the crime of murder. The court sentenced the defendant to a term of 20 years in the Department of Corrections.

The issues presented for review are: (1) whether the court erred in refusing to allow the defendant's expert witness to introduce into evidence, during redirect examination, certain hospital records; and (2) whether the trial court properly considered the validity of the defense of automatism.

The State's charge of murder alleged the defendant intentionally and knowingly stabbed and killed Patricia Robinson with a knife on February 18, 1978. On motion of the public defender, the defendant was ordered to be examined by the Psychiatric Institute of the Circuit Court of Cook County. Dr. Lorimer of the Psychiatric Institute requested that a Computer Axial Tomography scan, a highly sophisticated X-ray study of the brain, be performed on the defendant, which was granted. Later, the

defendant was sent for an EEG (electroencephalogram) with alcohol activation procedures.

On December 3, 1979, the cause came on for trial. The State's case in chief consisted of the testimony of the arresting officer, and certain stipulations.

The arresting officer testified that on February 18, 1978, he and another officer were on patrol between 3 and 11 p.m. when a radio broadcast came in of a man wanted for stabbing at the corner of Clark and Division Streets, in Chicago. The person wanted was described as a male Negro, six feet tall, wearing a blue jacket and a knit cap. At the corner of La Salle and Oak Streets, the witness saw the defendant, who fit the description, and the officers stopped near him.

The witness told the defendant to take his hands out of his pockets and the defendant replied that the officers would have to kill him. The officers got out of the squad car, and both drew their service revolvers. They again told the defendant to take his hands out of his pockets. At this time, the defendant charged at the two police officers.

The officers subdued the defendant and a pat down search revealed a butcher knife tucked in his pants. The knife measured about 13 inches in length. It had red stains on the blade, and there were red stains on the front of the defendant's clothing. The witness noticed the odor of alcohol on the defendant's breath, and later noticed a cut over defendant's eye.

The officers walked the defendant across the street to the emergency room of Henrotin Hospital. The victim, Patricia Robinson, was just being brought in. She pointed at the defendant and positively identified the defendant as the man who stabbed her. The defendant responded, "Yeah, I stabbed you, you, you no good, you're like all the rest, that's why I stabbed you." During the trial, the defendant at one point interrupted the testimony, accusing the arresting officer of lying about something having to do with the knife. At that time, a spectator shouted, "You killed my sister," and the defendant said, "I'm sorry, I'm sorry, I can't bring her back brother."

The parties stipulated as follows: (1) that the manager of the Hasty-Tasty Restaurant at 101 West Division in Chicago, if called to testify, would testify that a young black female came into the restaurant at about 7:30 p.m., said she was stabbed, and asked him to call the police; (2) if the deceased's mother were called to testify, she would testify that she had seen her daughter Patricia a few days before February 17, 1978, and saw her dead at the morgue; (3) if Dr. Kalelkar, a pathologist, were to testify, he would testify that he did an autopsy and found that Patricia Robinson died of massive bleeding due to a stab wound involving the liver and the right lung; (4) that the defendant was 44 years of age; and (5) that the partner of the arresting officer who testified would testify, if called, that

he took a knife from the defendant's coat, that the knife was tested for blood and that the blood was the same blood type as that of Patricia Robinson. The State then rested, and the defense proceeded. The defense never denied that the defendant stabbed the decedent, but claimed only that defendant's actions were not voluntary.

Evelyn Anderson testified for the defendant. Dr. Anderson, a licensed physician, has interpreted approximately 750,000 electroencephalographic records since 1962. One of Dr. Anderson's assistants, Mrs. Harriet DiVito, administered an electroencephalographic test on the defendant upon the request of the defendant's counsel. This test was to be administered twice, once before the defendant had ingested alcohol and once after. The test taken before the ingestion of alcohol revealed an abnormality in the defendant's interior temporal areas. As the abnormality was noticeably less while the defendant was asleep, the abnormality in the wave frequencies was not due to a tumor. This test also showed an abnormality in the defendant's brain stem which was indicative of an injury to the brain. It was noted that well over 30% of the 750,000 "EEG's" that the doctor has interpreted over the past 19 years exhibited these abnormalities. Furthermore, the doctor was unable to obtain a clear reading of the wave frequencies after the defendant ingested alcohol as the defendant became uncooperative and unable to lie quietly or sleep after taking the alcohol. In addition, the doctor did not form an opinion as to whether the defendant was legally sane at the time of the offense.

Dr. Frank M. Lorimer, a licensed physician specializing in psychiatry, examined the defendant on several occasions and found him fit to stand trial. However, Dr. Lorimer diagnosed the defendant as a psychotic with epilepsy due to head trauma and alcoholism. In the doctor's opinion, the defendant appeared to suffer from organic brain syndrome. This syndrome is characterized by five features. The defendant demonstrated one of these characteristics, namely, "lability of affect." "Lability of affect" is a vacillation of moods in a short period of time. There are two poles to this affect, one is hostility, anger and belligerence, and the other is remorse. He would talk to the doctor regarding the murder charge and then burst into tears, saying, "I didn't intend to do it." The doctor also stated that the defendant demonstrated impairment of judgment. Nevertheless, the doctor stated that the defendant possessed a superior intelligence and a superior memory.

Dr. Lorimer had also made a special study of "rage attacks," which are clinical manifestations of epilepsy. Dr. Lorimer was able to view the defendant after he ingested 5 ounces of alcohol during the administration of the "EEG" test. The defendant demanded the rest of the whiskey bottle, and, when this request was denied, he became verbally abusive

and threatening. The doctor characterized the defendant's actions as a "rage attack." On the basis of the defendant's reactions during this test and upon the doctor's examinations of the defendant, it was Dr. Lorimer's opinion that the defendant could not appreciate the criminality of his actions nor conform his conduct to the requirements of the law on the date of the alleged offense. The doctor also believed the defendant qualified as a pathological intoxicant. According to the doctor, when the defendant drinks whiskey, it complicates his organic brain syndrome and aggravates his epilepsy.

The defendant told the doctor that he drank around a pint of whiskey on the night of the offense, and Dr. Lorimer thought this amount was sufficient to impair the defendant's memory. The defendant told the doctor that he did not recall stabbing the victim, but he realized he had done something wrong when he found he was holding a bloody knife in his hand.

Dr. Gibbs, Dr. Lorimer's mentor and, according to Dr. Lorimer, "one of the best," interpreted an earlier "EEG" test performed on the defendant. It was Dr. Gibbs' opinion that the "EEG" examination results were normal. Dr. Lorimer indicated that the results of both of the "EEG" exams were the same, yet his interpretation differed from that of Dr. Gibbs. In addition, it appears that prior to Dr. Lorimer's examination, no other psychiatrist had diagnosed the defendant as having organic brain syndrome, despite defendant's six separate hospitalizations in various mental health facilities.

Dr. Jonathan Kelly, a rebuttal witness for the State, then testified. Dr. Kelly, a licensed physician specializing in psychiatry, examined the defendant on two separate occasions after his arrest. Dr. Kelly examined the defendant's past hospitalization records, the defendant's police reports, the reports from the Psychiatric Institute, including Dr. Lorimer's report, the "C.A.T." (brainwave) scan and the two "EEG" reports. After reviewing the various reports and studies on the defendant and after examining the defendant, Dr. Kelly stated that in his opinion the defendant was legally sane at the time of the offense. Dr. Kavanaugh joined Dr. Kelly in his opinion. Dr. Kelly diagnosed the defendant as having an explosive personality with paranoid and antisocial features. Despite this, Dr. Kelly stated that the defendant had a substantial capacity at the time of the offense to appreciate the criminality of his behavior and to conform his conduct to the requirements of the law at the time of the offense.

The court found that neither the defendant's organic brain syndrome nor his intense alcoholic consumption made the defendant so diseased mentally that he could not appreciate the criminality of his actions or conform his conduct to the requirements of law. Accordingly, the court

found the defendant guilty of murder and sentenced the defendant to the Illinois Department of Corrections for 20 years. The defendant now appeals said conviction and sentence.

The defendant claims the trial court erred in refusing to allow the defendant's expert witness to introduce into evidence, during redirect examination, certain hospital records.

On direct examination Dr. Lorimer testified that the defendant told him he had numerous "rage attacks," and detailed three of these attacks to the doctor.

On cross-examination, the State made a point of the fact that Dr. Lorimer's medical records reveal only a statement that, "He told me he had rage attacks of some ten or more years ago." In response to a question of whether there is any place in the doctor's medical records that says the defendant told of a lot of rage attacks, the doctor responded that the defendant told him of the attacks but that he did not write it down.

On redirect examination, Dr. Lorimer stated that a review of the records of the Department of Mental Health concerning hospitalizations revealed four progress notes indicating the defendant had violent "rage attacks" while a patient at Manteno State Hospital. The court then prohibited the doctor from reading the progress notes.

■■■ The trial court did not err in limiting Dr. Lorimer's testimony on redirect. On direct examination, Dr. Lorimer testified that the defendant had experienced a lot of episodes of "rage attacks." The prosecutor's cross-examination concerned itself primarily with the number of the defendant's "rage attacks." On redirect examination, the scope of such examination is limited to those matters raised on cross-examination, and the allowance of any redirect examination beyond that is within the trial court's discretion (*People v. Sanchez* (1979), 73 Ill. App. 3d 607, 392 N.E.2d 378). It was not error for the trial court to exercise its discretion in limiting Dr. Lorimer's testimony only to the number of defendant's "rage attacks." The defendant was allowed to rehabilitate Dr. Lorimer and show there was objective support for his impressions and diagnosis that the defendant was subject to "rage attacks." Dr. Lorimer was allowed to testify freely as to the number of defendant's "rage attacks." The doctor's testimony was properly limited to matters within the scope of cross-examination of Dr. Lorimer (see *People v. Krueger* (1968), 99 Ill. App. 2d 431, 241 N.E.2d 707).

The defendant also claims the trial court erred in not properly considering the validity of the defense of automatism.

The record reveals the trial judge considered the defense of automatism and agreed that the defendant did suffer from organic brain syndrome, but found that this did not preclude the defendant from

appreciating the criminality of his actions nor did it preclude the defendant from conforming his actions to those required by law.

The defendant claims that the trial court expressed reservations on the defense and that because of such reservations it failed to give proper consideration to the defense.

The court, in its considerations, stated as follows:

"The legal concept of diminished capacity has been present on the criminal justice scene for a few years; that concept arose and. received its greatest and broadest interpretation in the State of California and the concept itself has been generally used, particularly in California, with reference to an attempt to mitigate or negate the presence of a specific incident in crimes. Since the establishment of the concept, as could be expected, the practitioners and particularly the innovative defense and defense counsel have attempted to expand the concept and the diminished capacity defense, and superimpose it not only on those areas of law where specific intent is one of the requisite elements of the crime, but generally as a defense in any criminal case and particularly have the practitioners attempted to expand the concept in the area of mental capacity as the offense, that is to say insanity at the time of the commission of the offense.

The evidence in this case has shown and the Court has no reason to doubt that there is some organic damage that has been suffered by the defendant, Will Gaines, and the Court has no reason to doubt from the evidence that the medical name for that physical damage is an organic brain syndrome.

The Court also has no reason to doubt that in addition to being possessed, therefore of this organic brain syndrome which is illustrated in the DSM 2, the handbook of the American Psychiatric Institute and the handbook that is used by all practicing psychiatrists in the United States and the world for that matter, that the condition of the organic brain syndrome is considered a mental disease or mental defect.

There are sub-categories of that diagnosis contained in the DSM 2. Those sub-categories concern themselves with the ingestion of alcohol, pathological alcoholism is one of them, and the use of alcohol, even lending itself upon the organic brain syndrome disease or defect, DSM also speaks about the organic brain syndrome either with or without alcoholic effects as being of a psychotic or non-psychotic nature.

\* \* \*

The Court however, feels that neither his physical condition of

organic brain syndrome nor the fact that he had for some period of time been subjected to intense alcoholic consumption in such a manner so it made him an automiton, which he would have to be under your theory of the case to the extent that he committed the acts which lead to the death of this victim in this case, were illegal, wrong and against the law. And the Court is also of the opinion that the State has proven the guilt of the defendant beyond a reasonable doubt on the issue of his committing the acts which caused the death and also that the State has, beyond a reasonable doubt, proved the fact that Mr. Gaines was not, on February 18, 1978, so diseased mentally as to be unable to appreciate the criminality of his actions or unable to conform the conduct to the requirements of the law, and therefore the State has proven beyond a reasonable doubt each of the issues that they must prove in this case to sustain the finding which the Court will now render as to Mr. Gaines as to guilty of murder in manner and form as charged in the indictment."

██ The able and experienced trial court judge assigned to this case has had ample experience in dealing with the problems relating to the insanity defense (see *People v. Valdez* (1980), 79 Ill. 2d 74, 402 N.E.2d 187), and we are not convinced that the trial court did not give proper consideration to the defense interposed by defendant. The above language of the trial court reveals the court seriously considered the defense of automatism. The court's comments on the defense of diminished capacity and innovative defense counsel are remarks regarding a portion of the state of the law of insanity, and such remarks do not evidence any lack of consideration by the court of the defense of automatism. This is apparent in view of the court's comments regarding the defense of automatism and the facts of this case. The fact that the court found the defendant sane at the time of the offense demonstrates that the court considered and rejected as insufficient the evidence which was necessary to support a defense of automatism. The Illinois Supreme Court in *People v. Grant* (1978), 71 Ill. 2d 551, 377 N.E.2d 4, pronounced that the insanity defense exculpates a person whose volition is so impaired during a state of automatism that he is substantially incapable of conforming his conduct to the law (*Grant,* 71 Ill. 2d 551, 558). By finding the defendant was able to appreciate the criminality of his acts and able to conform his conduct to the requirements of the law, the court found that the defendant acted in a voluntary manner, and rejected the defense of automatism.

For the above and foregoing reasons the judgment of the circuit court of Cook County is hereby affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.