THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TIMOTHY CARTER, Defendant-Appellant.

Fourth District   No. 4—88—0802

Opinion filed January 18, 1990.—Rehearing denied February 23, 1990.

Daniel D. Yuhas and Lawrence Bapst, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Following a jury trial in the circuit court of Sangamon County, defendant Timothy Carter was convicted of attempt (murder), aggravated battery, and reckless conduct (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4(a), 9—1(a), 12—4(a), 12—5(a)). The court sentenced defendant to a term of 15 years' imprisonment on the offense of attempt (murder) only. Defendant now appeals. We reverse and remand.

On May 6, 1988, defendant was charged by information with attempt (murder). The information alleged that on May 5, 1988, defendant knowingly shot J.G. in the stomach with the intent to commit the offense of first degree murder. The case proceeded to trial, where the following facts were established.

Defendant lived with his girlfriend, Ceenola Dunkirk, and her two children for three years until the couple separated in October 1987. Dunkirk has two minor children, a daughter approximately 14 years old at the time of the trial, and a son approximately 13 years old. Months before the incident that gave rise to this case, defendant learned of rumors circulating in the community that he had abused Dunkirk's 14-year-old daughter. Defendant suspected that these rumors were started by Janet Hutchins, a woman defendant knew as a neighbor of Dunkirk at the John Hay Homes in Springfield. Defendant was also acquainted with the victim, J.G., who, although married to another woman, was known as Hutchins' boyfriend and the father of two of her three children. During the spring of 1988, defendant learned that someone reported him to the Department of Children and Family Services (DCFS). He suspected that Hutchins was responsible for this report.

On May 5, 1988, defendant came into contact with Hutchins and J.G. on four separate occasions. During the first meeting, which occurred that morning, Hutchins, J.G. and the defendant met in her apartment. Hutchins told defendant that Ceenola Dunkirk was the source of the rumors and advised the defendant to settle the matter with her. Early that afternoon, defendant again encountered Hutchins and J.G. During this meeting, defendant told J.G. that he did not believe Hutchins and directed threats toward the couple, the pre-

cise nature of which was disputed at trial. J.G., who had a cast on his right arm from the palm to the forearm, told defendant he could settle the matter with him in four weeks when the cast would be removed. Defendant then drove away, promising J.G. that he would see him in four weeks. Later that afternoon, Hutchins and J.G. returned home and encountered the defendant outside their apartment helping Callie Jones, a neighbor, move furniture. Defendant and J.G. exchanged a few words and then J.G. and Hutchins went into Hutchins' apartment. A short time later, J.G. went outside to speak with Ceenola Dunkirk, who was sitting in the alley behind her apartment. Hutchins went outside and asked J.G. to return to the apartment. A loud argument ensued between Dunkirk and Hutchins. Defendant viewed this scene from the end of the alley where he was standing, drinking gin and talking to a friend. A crowd began to gather. As defendant approached Hutchins and Dunkirk, he exchanged words with J.G. Hutchins, J.G. and Callie Jones testified that defendant told Hutchins and J.G. he was going to shoot one of them. Defendant testified that he did not recall making such threats. J.G.'s response to defendant's statements was undisputed. J.G. told defendant that if he was going to shoot someone, to shoot him rather than Hutchins because Hutchins had to raise his children. As J.G. turned toward Hutchins and told her to take the children and return to the apartment, defendant pulled a .22-caliber magnum revolver from his trousers and shot J.G. once through the abdomen. Defendant then handed his gun to a bystander and left the scene. The following day, defendant turned himself in to the Springfield police department.

No witness, including the defendant, testified that J.G. had directed any threatening gestures or remarks toward the defendant on the day of the shooting. Callie Jones suggested that J.G. was attempting to calm the defendant up until the moment he was shot.

The defendant testified that he and J.G. were friends and he knew J.G. to carry a gun because he had seen it several times over the course of their friendship. The defendant additionally stated that J.G. had advised him to carry a gun in the past. In his account of events which took place on the day of the shooting, defendant stated that as he approached the scene of the argument between Dunkirk and Hutchins and attempted to separate them, J.G. jumped in front of him. Defendant added, "when [J.G.] told me if I wanted to shoot somebody, shoot him, [J.G.] turned like he was trying to pull a gun because *** he turned this side to me like this and I snatched mine and shot him. I wasn't trying to kill him but I was trying to keep him from shooting me." Defendant did not state that he actually saw

a weapon in J.G.'s possession.

Jeremy Dunkirk, Ceenola Dunkirk's 13-year-old son, testified that he arrived home just after the shooting and saw Hutchins take a black revolver from behind J.G.'s back as he lay on the ground and hand it to a man named Mel. Hutchins denied recovering a weapon at the scene.

Hugh Bullock, also known as "Mel," denied that he was handed a gun at the scene of the shooting. Bullock additionally stated that on the morning of the shooting defendant said that he ought to shoot either J.G. or Hutchins because they were spreading rumors.

During the instruction conference held following the presentation of the evidence, defendant tendered the following self-defense instruction:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force."

See Illinois Pattern Jury Instructions, Criminal, No. 24—25.06, at 554 (2d ed. 1981) (IPI Criminal 2d).

Upon the State's objection, the court refused this instruction. The State then tendered its instruction on attempt (murder). Defendant objected, contending that the instructions should also include language relating to the included offenses of aggravated battery and reckless conduct. The trial court refused the State's instruction on attempt (murder) and later accepted defendant's instructions on aggravated battery, recklessness, and attempt (murder) over the State's objection.

The trial court then instructed the jury on the offenses of attempt (murder), aggravated battery and reckless conduct. Neither the defendant nor the State tendered an instruction on inconsistent verdicts, and none was given to the jury. After brief deliberation, the jury returned its verdict, finding defendant guilty of all three offenses. The trial court accepted the verdicts without objection from either party and excused the jury. After denying defendant's motion for a new trial, the court sentenced defendant to a term of 15 years' imprisonment on the offense of attempt (murder) only.

Defendant raises two issues on appeal. Defendant first contends that the trial court erred in refusing to instruct the jury on self defense. We agree.

■■ ■ Illinois courts have consistently held that "[a] defendant is entitled to have a jury consider his claim of the justifiable use of force where that defense has *some* foundation in the evidence. This is

true even where the evidence concerning that theory is very slight, inconsistent, or of doubtful credibility." (Emphasis in original.) (*People v. Dailey* (1989), 188 Ill. App. 3d 683, 688, 544 N.E.2d 449, 453, citing *People v. Rodriguez* (1981), 96 Ill. App. 3d 431, 421 N.E.2d 323.) In this case, defendant testified that he knew J.G. to carry a gun and stated that he shot him because J.G. appeared to be reaching for a gun. J.G.'s testimony supported the defendant's contention that he was turning his body as he was shot. Additionally, the testimony of Jeremy Dunkirk suggested that J.G. was armed at the time of the shooting. Admittedly, this evidence comes primarily from the defendant and his girlfriend's son, a boy who stated that he loved the defendant and wanted to help him. However, the credibility of witnesses can only be resolved by the jury and not by the trial court. (*People v. Brooks* (1985), 130 Ill. App. 3d 747, 751, 474 N.E.2d 1287, 1290.) In sum, although the evidence in this case supporting a self-defense instruction is slight and of questionable credibility, it was sufficient to warrant giving the instruction tendered by defendant.

■ To assist the trial court in the event of a retrial, we will address the defendant's second asserted error. Defendant contends that the verdicts finding him guilty of attempt (murder), aggravated battery, and reckless conduct are legally inconsistent and therefore cannot stand. The core of defendant's argument is that the defendant could not act intentionally or knowingly and at the same time act recklessly. Accordingly, defendant argues, all convictions must be reversed and the cause must be remanded for a new trial. *People v. Spears* (1986), 112 Ill. 2d 396, 493 N.E.2d 1030, provides conclusive support for defendant's contentions. In *Spears* the Illinois Supreme Court explained that legally inconsistent verdicts arise when, as in this case, a defendant is convicted of two or more crimes having mutually inconsistent mental states. The *Spears* court held that "where inconsistent guilty verdicts are returned, the defendant is entitled to a reversal of the judgment and a remand of the cause for a new trial on all counts." *Spears*, 112 Ill. 2d at 407, 493 N.E.2d at 1035.

The State contends that because defendant failed to request an instruction on inconsistent verdicts at trial and made no objection when the verdicts were returned, he should not now be allowed to obtain reversal based upon his own failure to act.

■ ■ Although it is generally the parties' rather than the trial court's duty to prepare and amend instructions (*People v. Grant* (1978), 71 Ill. 2d 551, 557, 377 N.E.2d 4, 7) and to object to improper verdicts at the time they are returned (*People v. Neither* (1988), 166 Ill. App. 3d 896, 902, 520 N.E.2d 1247, 1250), *Spears*

534

places these duties squarely on the shoulders of the trial court when the potential for legally inconsistent verdicts arises:

"In the case at bar, the instructions on the reckless conduct counts were tendered, at the defendant's request, to provide the jury with an alternative which would exonerate the defendant of the greater charges. As such, the trial judge had a duty to apprise the jury that it could find the defendant guilty of the lesser or greater offenses, but not both. When the jury returned with inconsistent guilty verdicts, the trial judge had a duty to send the jury back for further deliberations consistent with new instructions to resolve the inconsistency." *Spears*, 112 Ill. 2d at 410, 493 N.E.2d at 1036.

As the foregoing language indicates, in the absence of such action by the defendant, it is the trial court's duty to take the necessary steps to prevent or cure legally inconsistent verdicts.

Reversed and remanded.

KNECHT, P.J., and GREEN, J., concur.