# Illinois Official Reports

## Appellate Court

---

**People v. Nelson, 2013 IL App (3d) 120191**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT NELSON, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0191 |
| Filed | December 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for telephone harassment was reversed where the evidence showed defendant was diagnosed with Tourette's syndrome and obsessive compulsive tendencies, and although defendant made telephone calls to the victim, defendant's testimony and the testimony of an expert witness established that the calls were the result of involuntary tics that defendant could not control without medication and were not defendant's voluntary acts, and defendant's failure to take his medication during the period when he made the calls to the victim was not a voluntary act sufficient to support a criminal conviction, rather not taking his medication was a nonaction, especially in the absence of a legal duty to take the medication. |
| Decision Under Review | Appeal from the Circuit Court of Whiteside County, No. 10-CF-133; the Hon. Stanley B. Steines, Judge, presiding. |
| Judgment | Reversed. |

| Counsel on Appeal | Michael J. Pelletier and Rachel Moran (argued), both of State Appellate Defender's Office, of Chicago, for appellant. |
|---|---|
| | Trish Joyce, State's Attorney, of Morrison (Thomas D. Arado (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE McDADE delivered the judgment of the court, with opinion. Justices Holdridge and Lytton concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant Robert Nelson, who is diagnosed with Tourette's syndrome and obsessive compulsive tendencies, was charged with four counts of the crime of telephone harassment. 720 ILCS 135/1-1 (West 2010). During his bench trial, defendant presented uncontroverted expert testimony that he made the phone calls as part of a complex "tic" due to his Tourette's, and that he had no ability to control these tics. The trial judge found defendant guilty and sentenced him to serve three concurrent six-year terms in the Department of Corrections. Defendant appeals, arguing that the evidence was insufficient to prove beyond a reasonable doubt that he performed a voluntary act sufficient to result in criminal liability or to prove that he had the mental state required to commit the offense. We reverse defendant's conviction.

¶ 2                                          FACTS
¶ 3    Defendant Robert Nelson has suffered from Tourette's syndrome with obsessive compulsive tendencies for 30 years. On the evening of March 27, 2010, Nelson made a telephone call to Lois Miller, an 84-year-old resident of Sterling, Illinois. Nelson and Miller had never met, and Nelson picked her name and number out of the phone book at random. When Miller answered the phone, Nelson said "Lois, what are you doing?" She did not recognize the voice on the phone, but asked him what he was doing. He said, "[O]h, I'm just sitting here pulling it off." He then begged for her to come see him. Miller figured the caller was referring to "a sexual thing." The call frightened and offended her, so she hung up the phone.

¶ 4    The morning of April 11, 2010, Nelson called Miller again. When she answered, she recognized the voice from the previous call. Nelson said that he "was Ted Long calling from Victoria's Secret." He said that Miller had "won a prize," and "that the prize was a beautiful

- 2 -

padded *** bra and panty set." Nelson asked for her underwear sizes so he could send the right-sized prize. Miller, again finding the call embarrassing and offensive, hung up.

¶ 5    Miller contacted the police department the following day and spoke to Officer Franklin Hopes. Officer Hopes advised her to set up a "trap and trace" to discover the caller's phone number if he happened to call again. Miller then contacted her phone provider to set up the trap and trace.

¶ 6    Nelson called Miller again on the evening of April 26, 2010. She recognized the voice as the same as the one on the previous two calls. Nelson asked Miller to go out on a date with him. She refused, saying, "I'm not interested in you, I don't even know you." She slammed the phone down, but he immediately called back and told her his name was Rob. He said, "Lois, I'm going to level with you. A friend of mine gave me your picture, and I thought you were the most beautiful woman in Sterling, and I want[ ] to get a date around May 7th or 8th." Miller stayed on the phone long enough to trace the number, then hung up.

¶ 7    The next day, Officer Hopes received information from Miller's phone provider regarding the number from which Miller was called on April 26. Officer Hopes looked up the number and discovered it belonged to Nelson. On April 29, 2010, Miller met with Officer Hopes at the police station. They called Nelson's number, and the man who answered identified himself as Nelson. Miller recognized Nelson's voice as that of the man who had called her on the four prior occasions. Officer Hopes asked Nelson to come to the police station, and when he did so, Officer Hopes arrested him. On April 30, 2010, the State charged Nelson with four counts of telephone harassment. 720 ILCS 135/1-1 (West 2010).

¶ 8    Nelson waived a jury trial, and the cause proceeded to a bench trial on December 29, 2010. Both Miller and Officer Hopes were called during the State's case-in-chief. Miller testified about the content of the phone calls she received and her reaction to the calls. Officer Hopes testified to the circumstances of Nelson's arrest. By stipulation, the State also admitted Nelson's telephone records, which showed he called Miller's phone number on March 27, April 11, and twice on April 26, 2010. The State then rested.

¶ 9    Nelson testified on his own behalf. At the time of trial, Nelson was 37 years old, lived with his parents, and was unemployed but collecting disability. He had been diagnosed with Tourette's syndrome and obsessive compulsive disorder (OCD) when he was around 10 years of age. One of the manifestations of these disorders was that he obsessed with certain actions, such as repetitively locking doors or using the telephone. He also experienced motor tics, over which he had no control. Some of his motor tics were simple, such as kicking his arms or legs. Others were complex, such as touching a hot stove or locking a door. Nelson experienced verbal tics as well, which he stated were also involuntary. One verbal tic was simple: Nelson would say "feet" repeatedly.[1] Nelson described other vocal tics as complex. He stated that he

---

[1]Throughout the trial, the court reporter transcribed many instances of Nelson saying feet, both while other witnesses were testifying and while he was testifying himself. Nelson's outbursts occurred with varying frequency throughout the trial, but they are reflected on numerous pages of the trial transcript.

would involuntarily utter obscenities and racial slurs, and that he would even speak full sentences as part of his complex vocal tics.

¶ 10    Nelson also testified that he experienced "premonitory urges," related to his OCD, which are urges to perform a motor activity. He described "get[ting] something in my mind and I obsess over it and obsess, [and] I end up having to do it." If he did not perform the activity related to the premonitory urge, he would experience anxiety and panic, sometimes to the point of throwing up; Nelson said the urge "will eat at me and eat at me away until–until I do it. It's just–it's totally uncontrollable. I have no control over that." On cross-examination, the State pointed out that Nelson had not uttered any obscenities or racial slurs while in court, and Nelson stated that was because he was trying to control himself. When the State asked if Nelson could control his tics, he responded, "Not really. I hold it in as long as I can and then if I have an outburst, I have an outburst."

¶ 11    Nelson testified that he was taking medication for his OCD, and that it was helping, although it did not completely eliminate his symptoms. He was on medication during the trial.

¶ 12    Nelson admitted that he made the three phone calls to Miller. He stated that he had never met Miller, but just picked her name and number out of the phone book at random. Nelson denied that he called her with the intent to offend, abuse, or harass her, but admitted during cross-examination that he knew the statements he made would scare or offend an elderly woman. He testified he felt awful after making the calls, and he knew it was not right to say what he said, but he could not control his behavior. He also admitted that he never contacted his doctor to seek help specifically about making the phone calls to Miller.

¶ 13    Doctor Martin Fields, who had been Nelson's treating psychiatrist since 2009, testified as an expert in the field of psychiatry. He stated that Nelson's predominant diagnosis was for Tourette's disorder with obsessive compulsive symptoms. Dr. Fields testified that Nelson was prescribed a number of medications for his disorders: Luvox for his OCD symptoms, Risperdal for his agitation, and Haldol for his tics.

¶ 14    Dr. Fields stated that Nelson, due to his Tourette's with obsessive compulsive symptoms, experienced both simple and complex motor tics. Dr. Fields testified that a complex tic behavior could involve making phone calls and speaking full sentences. He stated that this sort of tic behavior was called coprolalia and it was commonly associated with Tourette's. Dr. Fields described a "tic" in the following exchange:

> "A. [Dr. Fields]: Yeah. A tic is an involuntary movement. We think of it as an automatic movement–
>
> THE DEFENDANT: Feet.
>
> A. –where cognitive control is not possible and simple tics like the one you are seeing right now are not under his voluntary control.
>
> THE DEFENDANT: Feet.
>
> A. –and the complex tics that you're referring to are no more under his control. It's not that he thinks about it and then can say I–I shouldn't do this. The tic is part of an automatic stimulus response motion that goes in one–one automatic motion from thought to action without any way to stop it.

- 4 -

THE DEFENDANT: Feet.

A. We think of [it] almost like seizures. You can see that right now. You–you see he is not capable of stopping the tic right now.

THE DEFENDANT: Feet. Feet.

A. He is trying but he cannot."

Dr. Fields further testified that it was common for patients with Tourette's disorder to perform complex actions under the influence of the tic, stating that the tics resulted in a "complex action that occurs as a result of some kind of *** brain activation that we don't yet understand."

¶ 15        One action that Nelson performed frequently was making phone calls, and he was obsessed with the phone. Dr. Fields opined that Nelson's behavior in calling Miller would be part of a tic action called coprolalia related to his Tourette's. According to Dr. Fields, calling a victim and saying "I'm just sitting here pulling one off" would be due to coprolalia, as would calling her and saying that he was a representative of Victoria's Secret, or calling to ask for a date. On cross-examination, Dr. Fields stated that, for Nelson, picking up the phone and dialing it, or even looking up a person's phone number in the phone book, were due to uncontrollable tics. While Dr. Fields was unaware whether Nelson previously said the exact statements he made in the phone calls to Miller, the same type of coprolalia had occurred in the past with Nelson. He also testified that it would be part of the coprolalia for Nelson to call the same person on multiple occasions, saying that it was common for patients with Tourette's to repeat the same type of action under similar circumstances, although he could not explain why.

¶ 16        According to Dr. Fields, Nelson was not capable of controlling his tics without medication. When Nelson was taking his medications, Dr. Fields observed an extreme decrease in the occurrence of Nelson's tics. He opined that while on his medication, Nelson was "really being rehabilitated." After Nelson was arrested, however, he told Dr. Fields that he was not taking his medication at the time he made the phone calls to Miller. The State asked whether it was a volitional act on Nelson's part to stop taking his medication. Dr. Fields responded that he thought Nelson ran out of his medication; while he had not checked his records to make sure, according to Dr. Fields' recollection, Nelson ran out of medication and could not make it back to get another prescription.

¶ 17        After Dr. Fields testified, the defense rested. The State did not present any rebuttal evidence, and the court then heard closing arguments. The State argued the evidence was sufficient to demonstrate that Nelson knowingly made the phone calls to Miller, and did so knowing it was wrong. The State further argued that Nelson's disease did not constitute an excuse for his criminal behavior; rather, he was similar to a drug addict who argued that he should be excused because of his addiction. Finally, the State contended that Nelson intentionally stopped taking his medicine, which constituted a volitional act on his part. The defense argued that the State failed to prove beyond a reasonable doubt that Nelson intended to harass or offend Miller, and also pointed out that the calls resulted from involuntary actions.

¶ 18        The trial court ruled that the State proved, beyond a reasonable doubt, that Nelson made the calls in question to Miller and that the statements he made contained indecent, lewd, harassing, or abusive language. The question for the court then became whether the nature of Nelson's

disability precluded a finding that he made the calls intentionally, or whether Nelson's actions were "under his control." The court stated that it was "incredible for this court to understand" that Nelson's behavior of choosing a number, dialing the phone, and making the lewd statements was all part of a complex tic action. But, "[a]s incredible as that seems to the Court, I do have to accept it because it came from the expert testimony of our expert ***. I don't have any expert from the State saying well that isn't part of a complex tic." However, the court pointed out that despite the fact that his medication seemingly stopped the tics, Nelson stopped taking his medication prior to making the calls. The court stated that Nelson "cannot rely upon his disease as an excuse for his uncontrolled or involuntary acts," because Nelson knew that he had problems with tics and making phone calls, but he did not take medication to prevent them. It concluded that Nelson's "failure without excuse to remain on his treatment does not rise to the level of a defense." Accordingly, the court found Nelson guilty of telephone harassment.

¶ 19    At sentencing, the court entered judgment on three counts of telephone harassment and sentenced Nelson to three concurrent terms of six years in the Department of Corrections. Nelson then filed a motion for a new trial, which the court denied. The court stated that even if Nelson's actions were part of a complex tic, that fact did not constitute a defense because he stopped taking his medication. The court compared Nelson's situation to an alcoholic who "can't resist consuming alcohol consumes alcohol[,] and because of their diminished capacity while under the influence of alcohol commits whatever offenses," such as battery, disorderly conduct, or driving under the influence.

¶ 20    Nelson filed a timely notice of appeal.


¶ 21                              ANALYSIS

¶ 22    In this appeal, Nelson has raised two arguments challenging his conviction. First, Nelson argues that the evidence presented at trial does not support a finding, beyond a reasonable doubt, that he performed voluntary acts when he made the phone calls to Miller. Second, he argues that the evidence does not support the conclusion that he intended to offend or harass, abuse, or threaten Miller by making the calls.

¶ 23    When a criminal defendant challenges the evidence as insufficient to support his conviction, a reviewing court considers whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). This standard applies both in jury trials and bench trials. *Wheeler*, 226 Ill. 2d at 114.

¶ 24    To evaluate Nelson's arguments, we must consider both the offense of telephone harassment itself and the fundamental elements of criminal liability. Nelson was convicted under sections 1-1(1) and 1-1(2) of the Harassing and Obscene Communications Act, which set out the offense of telephone harassment. 720 ILCS 135/1-1 (West 2010).[2] That statute provides, in the relevant parts:

---

[2]In 2013, the Harassing and Obscene Communications Act was repealed, and the offense of telephone harassment was recodified under article 26.5 of the Criminal Code of 2012. See Pub. Act 97-1108 (eff. Jan. 1, 2013) (adding 720 ILCS 5/26.5-2).

"Harassment by telephone is the use of telephone communication for any of the following purposes:

(1) Making any comment, request, suggestion, or proposal which is obscene, lewd, lascivious, filthy or indecent with an intent to offend; or

(2) Making a telephone call, whether or not conversation ensues, with intent to abuse, threaten or harass any person at the called number ***." 720 ILCS 135/1-1 (West 2010).

¶ 25        As with common law crimes, in Illinois a criminal offense requires that the defendant perform a prohibited act (the *actus reus*) with the prescribed mental state (*mens rea*), except for certain absolute liability offenses, which require no mental state. See *People v. Stiles*, 334 Ill. App. 3d 953, 956-57 (2002). For the crime of telephone harassment, subsection 1-1(1) prohibits the act of using the telephone to make obscene, lewd, lascivious, filthy or indecent comments. For subsection 1-1(2), the prohibited act is making the telephone call. *People v. Karberg*, 356 Ill. App. 3d 500, 502 (2005). For each subsection, the required mental state is intent. A defendant acts intentionally when his "conscious objective or purpose is to accomplish that result or engage in that conduct" proscribed by the statute. 720 ILCS 5/4-4 (West 2010). Accordingly, subsection 1-1(1) requires that the defendant's conscious objective or purpose be to offend the recipient of the call, while subsection 1-1(2) requires the defendant's conscious objective or purpose be to abuse, threaten, or harass a person at the called number. See *Karberg*, 356 Ill. App. 3d at 502. The State is required to prove each element of the crime beyond a reasonable doubt. *People v. Maggette*, 195 Ill. 2d 336, 353 (2001).

¶ 26        In addition to proving that the defendant performed the *actus reus* with the requisite *mens rea*, the State must also prove beyond a reasonable doubt that the defendant engaged in a voluntary act, for it is a "fundamental principle that a person is not criminally responsible for an involuntary act." *People v. Grant*, 71 Ill. 2d 551, 558 (1978). Thus, the Criminal Code of 1961 provides that "[a] material element of every offense is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing." 720 ILCS 5/4-1 (West 2010).

¶ 27        In *People v. Grant*, our supreme court discussed the voluntary act requirement in the context of the defense of automatism. The court stated:

"Certain involuntary acts, *i.e.*, those committed during a state of automatism, occur as bodily movements which are not controlled by the conscious mind. A person in a state of automatism lacks the volition to control or prevent the involuntary acts. Such involuntary acts may include those committed during convulsions, sleep, unconsciousness, hypnosis or seizures. [Citations.] A cornerstone of the defense of involuntary conduct is that a person, in a state of automatism, who lacks the volition to control or prevent his conduct, cannot be criminally responsible for such involuntary acts." *Grant*, 71 Ill. 2d at 558.

The *Grant* court noted that the committee comments to section 4-1 of the Criminal Code of 1961 cited to the Model Penal Code's provision on the voluntary act requirement. *Grant*, 71 Ill.

2d at 558 (citing Ill. Ann. Stat., ch. 38, ¶ 4-1, Committee Comments–1961, at 250 (Smith-Hurd 1972), citing Model Penal Code § 2.01, cmt. 3, at 121 (Tent. Draft No. 4 (1955))). The Model Penal Code states that the following are not voluntary acts:

> "(a) a reflex or convulsion;
>
> (b) a bodily movement during unconsciousness or sleep;
>
> (c) conduct during hypnosis or resulting from hypnotic suggestion;
>
> (d) a bodily movement that otherwise is not a product of the effort or determination of the actor, either conscious or habitual." Model Penal Code § 2.01(2) (1962).

¶ 28   Thus, the law is clear that where a bodily movement is not the result of a defendant's volition or control, it is an involuntary act for which the defendant cannot be held criminally liable. *Grant*, 71 Ill. 2d at 558. See also *People v. Martino*, 2012 IL App (2d) 101244, ¶ 15 (where police used a Taser on defendant, rendering him incapable of controlling his muscles, and defendant fell on victim, the contact with victim was the result of an involuntary act, which could not sustain an aggravated domestic battery conviction).

¶ 29   Turning to the case at bar, we agree with Nelson's argument that the uncontroverted evidence presented at trial cannot support a conclusion that he acted voluntarily when he made the phone calls to Miller. It is undisputed that Nelson actually made the calls in question. But the expert testimony of Dr. Fields, along with Nelson's own testimony, demonstrates that the phone calls were not acts done under Nelson's conscious control. Dr. Fields testified that patients with Tourette's could perform complex actions as part of involuntary tics. He described Nelson's tic as "an automatic stimulus response" where cognitive control is not possible. Dr. Fields repeatedly stated that without medication, Nelson could not control the tics. Dr. Fields testified that Nelson's behavior of selecting a number, dialing it, and saying lewd or offensive things were all part of a complex tic resulting from his Tourette's. The State did not present a rebuttal expert to testify that Nelson's actions were voluntary, or to otherwise refute any of Dr. Fields' testimony. The trial court concluded that it had to adopt Dr. Fields' uncontroverted expert testimony that Nelson did not act voluntarily in making the phone calls, which was proper. See *Morus v. Kapusta*, 339 Ill. App. 3d 483, 492 (2003) (holding that the trier of fact cannot disregard uncontroverted expert testimony when this testimony pertains to medical issues "beyond the understanding of a layperson" (internal quotation marks omitted)). Thus, the evidence demonstrates that Nelson acted pursuant to an involuntary tic when he made the calls in question.

¶ 30   The State argues that even if Nelson's acts of making the phone calls were pursuant to involuntary tics, he could have prevented the tics by taking his medication. Echoing the rationale of the trial court, the State argues that Nelson's failure to take his medication thus constituted a voluntary act sufficient for criminal liability. We disagree.

¶ 31   It is clear that Nelson was not taking his medication at the time he made the phone calls and therefore he could not control his tics. But there was no evidence presented that he purposefully stopped taking his medication; the only evidence on this issue was the testimony of Dr. Fields, whose uncertain recollection was that Nelson ran out of medication and was unable to obtain more. Despite the opportunity to question Nelson about his failure to take

medication at the time the calls were made, the State neglected to do so. We do not think, based on this record, a rational trier of fact could infer that Nelson voluntarily stopped taking his medication *with the intent* to make harassing or offensive phone calls.

¶ 32 Accordingly, we conclude that Nelson's failure to take his medication constitutes an omission, not an action. "Not taking his pills" was not an affirmative act. Rather, Nelson engaged in nonaction–he simply did not take medication. The Criminal Code makes clear that an omission satisfies the voluntary act requirement only if it involves "an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing." 720 ILCS 5/4-1 (West 2010). See also *People v. Stanciel*, 153 Ill. 2d 218, 237 (1992). The State did not present any evidence at trial, nor has it pointed to any legal authority here on appeal, to demonstrate that Nelson had a legal duty to take his medication. We therefore hold that Nelson's failure to take his pills does not constitute a voluntary act sufficient for criminal liability. Because the State failed to prove the material element of a voluntary act, Nelson's conviction must be reversed, and we need not address his *mens rea* argument.

¶ 33 We emphasize that our holding here is a narrow one: we conclude merely that, due to the uncontroverted expert testimony of Dr. Fields, no rational trier of fact could have concluded that Nelson performed voluntary acts in placing the offensive phone calls to Miller. We also conclude that, on the basis of the specific evidence in this case, Nelson's failure to take medication that could have alleviated his tics was not a voluntary act for the purposes of violating the statute in question. Our holding should not be interpreted as stating that, as a matter of law, acts performed pursuant to complex tics by persons with Tourette's disorder are always involuntary–whether an act is voluntary should be determined based on the facts of each particular case and the evidence presented at trial.

¶ 34 CONCLUSION

¶ 35 For the foregoing reasons, the judgment of the circuit court of Whiteside County is reversed.

¶ 36 Reversed.