[Cite as *State v. Ireland*, 2017-Ohio-263.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                              :

    Plaintiff-Appellee,          :

                                             No. 15AP-1134

v.                                          :         (C.P.C. No. 14CR-362)

Darin K. Ireland,                           :         (REGULAR CALENDAR)

    Defendant-Appellant.        :

D E C I S I O N

Rendered on January 24, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton*.

**On brief:** *Giorgianni Law LLC*, and *Paul Giorgianni*, for appellant. **Argued:** *Paul Giorgianni*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Darin K. Ireland, appeals the December 8, 2015 judgment of the Franklin County Court of Common Pleas convicting him, pursuant to a jury verdict, and imposing sentence. For the following reasons, we reverse the judgment of the trial court.

## I. History

### A. Factual History

{¶ 2} On October 19, 2013, appellant, his wife, Pam Ireland, his friend, Tyler Thrash, and Tyler Thrash's girlfriend, were at Cappy's Bar in Blacklick, Ohio for a fundraiser for a military combat veteran's organization. Between 7 and 8 p.m. on the same night, Drew Coen and his brother, Cris Coen, also arrived at Cappy's Bar.

{¶ 3} According to Thrash, around midnight, a very intoxicated man grabbed Pam's buttocks as he exited the bar. Thrash followed the man, later identified as Drew, out of the bar, placed him in a headlock, and forced him to the ground. Thrash told Drew: "Don't touch my brother's girl's ass ever again." (Thrash Depo. at 2:12:30.)[1] After he forced Drew to the ground, Thrash was pulled away by appellant and others. Thrash returned to the bar and resumed drinking. Shortly afterward, he heard a commotion outside. When he exited the bar, he saw appellant hitting someone in the parking lot. Seconds after observing appellant hitting the person "one to two times," Thrash and his girlfriend left the bar. (Thrash Depo. at 2:17:30.) Thrash testified that he and appellant had been drinking prior to this incident.

{¶ 4} Louis Capodanno, the owner of Cappy's Bar at the time of the incident, testified that he observed appellant's actions before Thrash attacked Drew. According to Capodanno, immediately before the incident, appellant was "his normal self" and was not intoxicated. (Tr. Vol. III at 261.) When Capodanno witnessed Thrash assaulting Drew, he and appellant tried to pull Thrash away from Drew. Capodanno then heard Thrash say to Drew, "You wanna touch one of our women?" Appellant then asked Drew, "Whose woman did you touch? You touched my woman?" (Tr. Vol. III at 262.) Capodanno then moved to assist Drew. While Capodanno was moving Drew away from the building into the parting lot, appellant said, "You wanna touch one of our women?" and began hitting Drew. (Tr. Vol. III at 266.) Capodanno tried to shield Drew with his own body and received kicks and punches from appellant.

{¶ 5} Theresa Luginbuhl, a manager at Cappy's Bar, testified that she observed appellant assault Drew in the parking lot outside the bar. Luginbuhl ran back inside the bar to call 911. When she came back outside after calling 911, she witnessed appellant striking Drew:

> [Luginbuhl]: I came out and I had called the cops and I came out and I saw [Capodanno] was on top of Drew Coen, and [appellant] was punching [Capodanno].
>
> * * *

---

[1] We note that Thrash's testimony was taken before a magistrate prior to trial. A video recording of his testimony was played to the jury at trial. Although this recording was not transcribed in the record, we note the location of the testimony in question by reference to a time-stamp present in the recording.

> I saw [Capodanno] on top of [Drew], and I saw someone try to pull [appellant] off, but [appellant] wouldn't -- [appellant] wouldn't stop.
>
> * * *
>
> [Appellant] was still punching and probably still would have been stomping.
>
> * * *
>
> [Assistant Prosecutor]: So Drew -- Drew is on the ground; [Capodanno] is on top of him protecting him. What was [appellant] doing?
>
> [Luginbuhl]: Punching, punching, trying to get to Drew but punching [Capodanno]. I mean, he didn't care. He was just punching. He didn't care what was in his way, who it was. He didn't care. He would have punched anyone.

(Tr. Vol. III at 237-38, 241.)

{¶ 6} Adam Joseph McMillen testified that he witnessed Thrash assault Drew. According to McMillen, he, Capodanno, and appellant pulled Thrash away from Drew. After they pulled Thrash away from Drew, Thrash ran across the parking lot, and punched Drew in the face. McMillen then heard Pam screaming and saw appellant standing over Drew punching and kicking him. McMillen testified that appellant appeared very angry and "had this tunnel vision, like when you get in a fight." (Tr. Vol. II at 188.) McMillen witnessed appellant fall and then he stopped assaulting Drew. According to McMillen, "it was just like he was just kind of stumbling around, out of it." (Tr. Vol. II at 167.) McMillen then helped place appellant in Pam's car.

{¶ 7} According to Cris Coen, around 1 a.m., he and his brother exited the bar together when he was summoned back inside to sign a receipt by Luginbuhl. He signed the receipt and then went to the restroom. Shortly afterward, he was informed that his brother had been injured. Cris testified that, at first, he did not recognize Drew because of the severity of his injuries and the amount of blood covering his face and clothing. After recognizing his brother, Cris ran into the bar to grab towels which he then used to apply pressure to the injuries to Drew's face.

{¶ 8} Drew testified that he drank "quite a bit" of alcohol at the bar and was "pretty intoxicated that night." (Tr. Vol. II at 101; 80.) He recalled leaving the bar with

Cris who was then summoned back inside the bar to sign a receipt. Drew testified that his next memory was waking up in OhioHealth Grant Medical Center in Columbus, Ohio. For some days following his arrival at the hospital, Drew suffered from memory loss and was unable to recall anything between his exiting the bar and waking up at the hospital. However, after some time, Drew testified that some of his memory of the night returned and he now recalls someone approaching him from behind and choking him.

{¶ 9} Drew received treatment for severe injuries to his face and head in addition to pain in his knee. Dr. Mark Douglas Wells, a physician at OhioHealth Grant Medical Center, testified that when Drew arrived at the hospital, he was alert and suffering from a variety of injuries including swelling around his eyes, a broken nose, and a broken upper jaw. At the hospital, it was determined that Drew had a blood alcohol content of .3. Drew underwent three surgeries to repair the damage to his face and head. As a result of the incident, Drew suffered from chronic pain, scarring, permanent physical injuries, and psychological injuries.

{¶ 10} At trial, the defense called James P. Reardon, Ph.D., a psychologist, as its sole witness. Following the incident, Dr. Reardon performed a psychological examination of appellant. Dr. Reardon testified that it was his opinion within a reasonable degree of psychological certainty that appellant was experiencing a dissociative episode when he attacked Drew. According to Dr. Reardon, appellant's dissociative episode was a manifestation of post-traumatic stress disorder ("PTSD"), from which appellant suffered as a result of his experience in the Persian Gulf War in 1991. Dr. Reardon testified that as a result of appellant's combat experience, he had "a significant capacity for dissociation." (Tr. Vol. III at 346.) Dr. Reardon offered the following explanation for dissociative episodes:

> [Appellant's Counsel]: And when a person experiences what you call a "dissociative episode," if that happens, do they have a conscious awareness of what's going on around them?
>
> [Dr. Reardon]: No. I mean, a dissociative episode, by definition, is an alteration in consciousness, memory, and the ability to make kind of rational decisions. I mean, the whole point of dissociating is if you can't escape -- it's been described as dissociation is an escape when there's no escape * * * when you can't physically remove yourself.
>
> * * *

[Appellant's Counsel]: Are you saying then that's a conscious decision to escape to this dissociative place?

[Dr. Reardon]: No. I mean, by definition, it is not a volitional experience. It's not something you do; it's something you experience.

[W]hen they disassociate [sic], when they are in a flashback, it's a disorientation for right here, right now because they feel like they're right there, right then. * * * And their reactions are automatic reactions that kind of kept them alive.

(Tr. Vol. III at 357-58; 360.) Under cross-examination, Dr. Reardon explained whether someone who is experiencing a dissociative episode is acting voluntarily or involuntarily:

[Assistant Prosecutor]: [I]n this incident, [appellant] reported having no memory of the contact?

[Dr. Reardon]: It's an alteration of consciousness. And then when a dissociative episode occurs, people don't consciously -- they're not consciously present at that moment.

* * *

[Assistant Prosecutor]: [I]f someone's disassociated [sic], you're saying this action is involuntary; right? They have no control over it?

[Dr. Reardon]: It's not a manifestation of conscious thought or awareness.

[Assistant Prosecutor]: Okay. Meaning they can't control it?

[Dr. Reardon]: They don't control it.

* * *

[A]nd they can't because it's not a product of their consciousness and decision making.

(Tr. Vol. III at 381, 387.)

{¶ 11} For purposes of rebuttal, plaintiff-appellee, State of Ohio, offered the testimony of Dennis Eshbaugh, Ph.D., a clinical and forensic psychologist. Dr. Eshbaugh stated that, based on his review of appellant's records, including Dr. Reardon's report, it was his opinion within a reasonable degree of psychological and scientific certainty that

"the evidence argued against PTSD and argued in favor of substance abuse having anything related to the instant charge." (Tr. Vol. IV at 515.) Dr. Eshbaugh stated that he did not interview appellant and therefore could not diagnose him.

### B. Procedural History

{¶ 12} On January 22, 2014, a Franklin County Grand Jury filed an indictment charging appellant with a single count of felonious assault, in violation of R.C. 2903.11, a felony of the second degree. On October 26, 2015, the matter proceeded to trial. At trial, appellant requested an instruction on the defense of "blackout" as contained in The Ohio Jury Instruction Manual ("The OJI"). The OJI provides the following instruction on blackout:

> 1. DEFINED. Where a person commits an act while unconscious as in a (coma) (blackout) (convulsion) due to (heart failure) (disease) (sleep) (injury), such act is not a criminal offense even though it would be a crime if such act were the product of a person's (will) (volition).

> 2. CONCLUSION. If you have a reasonable doubt whether the defendant was conscious at the time of such act, you must find that he is not guilty. If you find that the defendant was conscious, such finding does not relieve the state of its burden of establishing by the required weight of the testimony (all elements of the crime charged) (any lesser included offense) [that the act was (purposely) (knowingly) committed].

Ohio Jury Instructions, CR Section 417.07 (2016).

{¶ 13} The state objected to the inclusion of the instruction. Additionally, the state argued that the defense of "blackout" was an affirmative defense for which appellant bore the burden of proof. Appellant repeatedly objected to the characterization of "blackout" as an affirmative defense. After hearing arguments, the trial court concluded that it would instruct the jury on blackout, and found that blackout was an affirmative defense. The court then issued the following instruction:

> The defendant is asserting an affirmative defense known as blackout.

> The burden of going forward with the evidence of blackout and the burden of proving an affirmative defense is upon the defendant. He must establish such a defense by a preponderance of the evidence.

> Preponderance of the evidence is the greater weight of the evidence; that is, evidence that you believe because it

outweighs or overbalances, in your minds, the evidence opposed to it.

A preponderance means evidence that is more probable, more persuasive, or of greater probative value. It is the quality of the evidence that must be weighed. Quality may or may not be identical with the greater number of witnesses.

In determining whether or not an affirmative defense has been proved by a preponderance of the evidence, you should consider all the evidence bearing upon that affirmative defense regardless of who produced it.

If the weight of the evidence is equally balanced or if you are unable to determine which side of an affirmative defense has the preponderance of evidence, then the defendant has not established such affirmative defense.

If the defendant fails to establish the defense of blackout, the State still must prove to you beyond a reasonable doubt all the elements of the crime charged.

Where a person commits an act while, as in a coma, blackout, or convulsion due to heart failure, disease, sleep, or injury, such act is not a criminal offense even though it would be a crime if such act were the product of a person's will or volition.

If you have a reasonable doubt whether the defendant was conscious at the time of such act, you must find that he is not guilty. If you find that the defendant was conscious, such finding does not relieve the State of its burden of establishing by the required weight of the testimony that the act was knowingly committed.

This instruction would not apply to one who recklessly or negligently became intoxicated.

Reflexes, convulsions, body movements during unconsciousness or sleep and body movements that are not otherwise a product of the act's will or volition are involuntary acts.

Intoxication is not an excuse for an offense.

(Tr. Vol. V at 646-48.)

{¶ 14} On October 30, 2015, the jury returned a verdict of guilty on the count charged in the indictment. On December 7, 2015, the trial court held a sentencing hearing. At the hearing, the court sentenced appellant to a six-year term of incarceration and a three-year mandatory period of post-release control. On December 8, 2015, the trial court filed a judgment entry reflecting appellant's conviction and sentence.

## II. Assignments of Error

{¶ 15} Appellant appeals and assigns the following five assignments of error for our review:

> [I.] The court instructed the jury that Mr. Ireland had the burden of proving his defense, thereby depriving Mr. Ireland of his constitutional right to a jury trial under the "beyond a reasonable doubt" standard of proof.
>
> [II.] Prosecutorial misconduct during closing argument violated Mr. Ireland's due-process right to a fair trial.
>
> [III.] The cumulative effect of errors violated Mr. Ireland's due-process right to a fair trial.
>
> [IV.] The judge misstated OJI 417.07 by omitting the word "unconscious."
>
> [V.] The judge failed to give a curative instruction when the State's psychology expert purported to tell the jury "what the law requires."

## III. Discussion

### A. First Assignment of Error—Burden of Proof

{¶ 16} In his first assignment of error, appellant asserts the trial court erred by instructing the jury that blackout was an affirmative defense and, therefore, appellant bore the burden of proving the defense of blackout by a preponderance of the evidence. Appellant contends that by failing to properly instruct on the state's burden to prove all essential elements of the crime beyond a reasonable doubt, the trial court committed structural error. Importantly, we note that the state does not contest on appeal whether it was proper for the trial court to offer the instruction on blackout. Instead, the state argues only that the trial court properly instructed that appellant bore the burden of proving the defense of blackout as an affirmative defense.

### 1. **Standard of Review**

{¶ 17} Crim.R. 52 affords appellate courts limited power to correct errors that occurred during criminal proceedings in the trial court. Crim.R. 52 provides:

> **(A) Harmless error.** Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.
>
> **(B) Plain error.** Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

Thus, Crim.R. 52(B) distinguishes between errors to which a defendant objected at trial and errors that a defendant failed to raise at trial. *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 14. If the defendant failed to raise an error affecting substantial rights at trial, an appellate court reviews the error under the plain error standard in Crim.R. 52(B). Under that rule, the defendant bears the burden of demonstrating that a plain error affected his substantial rights. *See id.*, citing *United States v. Olano*, 507 U.S. 725, 734 (1993). "Even if the defendant satisfies this burden, an appellate court has discretion to disregard the error and should correct it only to ' "prevent a manifest miscarriage of justice." ' " *Id.*, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 18} However, if the defendant has objected to an error in the trial court, an appellate court employs a more lenient standard of review, namely the "harmless error" standard in Crim.R. 52(A). *Perry* at ¶ 15, citing *United States v. Curbelo*, 343 F.3d 273, 286 (4th Cir.2003). Under Crim.R. 52(A), the state bears the burden of demonstrating that the error, if any, did not affect the substantial rights of the defendant. *Olano* at 741; *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 136 ("Once [the defendant] objected to the [error], the burden shifted to the state to demonstrate an absence of prejudice."). "This burden-shifting device 'is dictated by a subtle but important difference in language between the two parts of Rule 52: While Rule 52(a) precludes error correction only if the error "does *not* affect substantial rights," (emphasis added), Rule 52(b) authorizes no remedy unless the error *does* "affect substantial rights." ' " *Perry* at ¶ 15, quoting *Olano* at 734-35. Unlike under Crim.R. 52(A), an appellate court must reverse the defendant's conviction if the state fails to satisfy its burden under Crim.R. 52(B). *Id.*, citing *Olano* at 735-36.

{¶ 19} Here, appellant objected to the trial court's characterization of the blackout defense as an affirmative defense. Therefore, we would ordinarily review the purported error under the harmless error standard provided in Crim.R. 52(A). Appellant, however, contends that due to the nature of this purported error, we should review for "structural error." (Appellant's Brief at 91-92.)

{¶ 20} The United States Supreme Court has recognized that " 'most constitutional errors can be harmless.' " *Neder v. United States*, 527 U.S. 1, 8 (1999), quoting *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991). Indeed, "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 579 (1986). However, certain constitutional errors, termed "structural errors," have been recognized to "defy analysis by 'harmless error' standards." *Fulminante* at 309. Structural errors are defined as constitutional defects that " 'affect[] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself.' " *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, ¶ 9, quoting *Fulminante* at 310. Structural errors permeate "the entire conduct of the trial from beginning to end," rendering the trial court unable to " 'reliably serve its function as a vehicle for determination of guilt or innocence.' " *Fulminante* at 309-10, quoting *Rose* at 577-78. As a result of the severity of their impact on the proceedings, structural errors "require automatic reversal (*i.e.*, 'affect substantial rights') without regard to their effect on the outcome." *Neder* at 7; *see also Perry* at ¶ 17.

{¶ 21} "Consistent with the presumption that errors are not 'structural,' the United States Supreme Court 'has found an error to be "structural," and thus subject to automatic reversal, only in a "very limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468 * * * (1997) (citing *Gideon v. Wainwright*, 372 U.S. 335 * * * (1963) (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510 * * * (1927) (biased trial judge); *Vasquez v. Hillery*, 474 U.S. 254 * * * (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins*, 465 U.S. 168 * * * (1984) (denial of self-representation at trial); *Waller v. Georgia*, 467 U.S. 39 * * * (1984) (denial of public trial); *Sullivan v. Louisiana*, 508 U.S. 275 * * * (1993) (defective reasonable-doubt instruction).' " *Perry* at ¶ 18, quoting *Neder* at 8.

{¶ 22} The United States Supreme Court has recognized "[w]hat the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause." *Sullivan* at 277. Specifically, "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged." *Patterson v. New York*, 432 U.S. 197, 210 (1977). *See In re Winship*, 397 U.S. 358, 364 (1970) (holding that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"). Furthermore, the "beyond a reasonable doubt" standard applies in both state as well as federal proceedings. *Sullivan* at 278, citing *Winship*.

{¶ 23} In *Sullivan*, the United States Supreme Court found that "the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated." *Id.* at 278. The United States Supreme Court stated that "[i]t would not satisfy the Sixth Amendment to have a jury determine that the defendant is *probably* guilty, and then leave it up to the judge to determine (as *Winship* requires) whether he is guilty beyond a reasonable doubt." (Emphasis sic.) *Id.* Therefore, "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." *Id.* Finally, in considering whether to apply the harmless error or structural error standard of review, the United States Supreme Court found that "[d]enial of the right to a jury verdict of guilt beyond a reasonable doubt * * * with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.' " *Id.* at 281-82.

{¶ 24} Here, appellant asserts the trial court failed to properly instruct the jury regarding the reasonable doubt standard. We agree and, consistent with *Sullivan*, review for structural error.

### 2. **Applicable Law**

{¶ 25} Generally, criminal offenses contain two elements: the "actus reus," or "guilty act," and "mens rea," or "guilty mind." *State v. Johnson*, 128 Ohio St.3d 107, 2010-Ohio-6301, ¶ 8 ("Generally, an offense will be defined in terms of a prohibited act accompanied by a culpable mental state, the 'mens rea' or guilty mind."); *State v. Hackedorn*, 5th Dist. No. 2004-COA-053, 2005-Ohio-1475, ¶ 35 ("An essential element of every crime is the defendant's actus reus, or criminal act."). *See* Joshua Dressler,

*Understanding Criminal Law*, Sections 9.01 and 10.01 (7th Ed.2015). R.C. 2901.21 codifies these basic requirements for criminal liability, providing in pertinent part:

> (A) [A] person is not guilty of an offense unless both of the following apply:
>
> (1) The person's liability is based on conduct that includes either a voluntary act, or an omission to perform an act or duty that the person is capable of performing;
>
> (2) The person has the requisite degree of culpability for each element as to which a culpable mental state is specified by the language defining the offense.

"Thus, every criminal offense is made up of (1) a voluntary act or failure to act when there is a duty and (2) a culpable mental state for each element that specifies a mental state." *Johnson* at ¶ 16.

{¶ 26} Furthermore, Ohio has codified the burden of proof in all criminal proceedings. R.C. 2901.05. *See State v. Jenkins*, 15 Ohio St.3d 164, 210 (1984). R.C. 2901.05(A) provides:

> Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused.

Thus, R.C. 2901.05 contains two different burdens of proof. First, with regard to all of the essential elements of the offense, the burden of proof remains on the state. This remains true where the defendant presents evidence tending to disprove an essential element of the case.[2] Second, the defendant bears the burden of proof by a preponderance of the

---

[2] We note some examples of defenses where the burden of proof remains on the state include alibi and accident or mistake of fact. *State v. Childs*, 14 Ohio St.2d 56, 64 (1968) (stating that "the general rule, followed in this jurisdiction, that the burden of proof remains with the state even with respect to alibi evidence"); *State v. Wilson*, 2d Dist. No. 24577, 2012-Ohio-3098, ¶ 115, citing *State v. Goetz*, 1st Dist. No. C-970503 (Oct. 23, 1998); *State v. Shaw*, 10th Dist. No. 98AP-1338 (Sept. 23, 1999); *State v. Poole*, 33 Ohio St.2d 18, 20-21 (1973) ("[I]t has long been established that accident is not an affirmative defense in this state. * * * Accident is generally embraced in a charge dealing with the elements of the offense and the burden imposed upon the state to establish the existence of those elements); *State v. Snowden*, 7 Ohio App.3d 358, 363 (10th Dist.1982) ("When defendant, due to a mistake of fact, does not have the specific *mens rea* required by the statute, the maxim *ignorantia facti excusat* applies. * * * Mistake of fact can, in an appropriate circumstance, negate either 'knowingly' or 'purposely.' "); *State v. Cooper*, 10th Dist. No. 09AP-511, 2009-Ohio-6275, ¶ 9.

evidence for affirmative defenses.  An affirmative defense is defined as either "[a] defense expressly designated as affirmative," or "[a] defense involving an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence."  R.C. 2901.05(D)(1)(a) and (b).  Thus, where the defendant does not seek to negate an element of the charged offense, the defendant bears the burden of demonstrating an excuse or justification in order to defeat criminal liability.[3]

{¶ 27} The statutory authority cited for the defense at issue in the present matter, i.e., unconsciousness or blackout[4] can be found in R.C. 2901.21(E)(2), which provides: "Reflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the actor's volition, are involuntary acts." *See Hackedorn* at ¶ 39, citing former R.C. 2901.21(C)(2).

{¶ 28} Here, blackout is not expressly designated by statute as an affirmative defense.  Therefore, we must determine whether blackout relates to an essential element of the crime or is "[a] defense involving an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence."  R.C. 2901.05(D)(1)(b).

{¶ 29} Legal scholars have recognized that the issue of whether a voluntary act is an element of a crime is an issue of considerable debate.  *See* Joshua Dressler, *Understanding Criminal Law*, Sections 9.02 and 10.01 (7th Ed.2015) ("There is serious dispute regarding whether 'involuntariness'—claims of seizure, acts during unconsciousness, and the like—should be characterized as a 'defense.' "); Farrell and

---

[3] By way of example, we note that the affirmative defense of self-defense, where established, provides a justification for an act that would otherwise be considered criminal conduct. *See State v. Martin*, 21 Ohio St.3d 91, 94 (1986) ("[T]he burden of proving self-defense by a preponderance of the evidence does not require the defendant to prove his innocence by disproving an element of the offense with which he is charged. * * * Self-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged."); *State v. Edgerson*, 8th Dist. No. 101283, 2015-Ohio-593, ¶ 17 (noting that "self-defense is unlike other defenses in that it is more than a denial or contradiction of the prosecution's evidence of the essential elements of the charged crime"). Similarly, insanity has been recognized as an affirmative defense. *State v. Filiaggi*, 86 Ohio St.3d 230, 242 (1999), citing *State v. Brown*, 5 Ohio St.3d 133 (1983) ("A plea of not guilty by reason of insanity is an affirmative defense that must be proven by a preponderance of the evidence.").

[4] This defense is also referred to as "automatism." *See* Melissa Hamilton, *Reinvigorating Actus Reus: The Case for Involuntary Actions by Veterans with Post-Traumatic Stress Disorder*, 16 Berkeley J. Crim. L. 340, 352 ("Automatistic actions are generally accepted as a category of involuntary act for purposes of abrogating criminal culpability."); *Black's Law Dictionary* 160 (10th Ed.2014) ("Automatism may be asserted as a criminal defense to negate the requisite mental state of voluntariness."); 2 Wayne R. LaFave, *Substantive Criminal Law*, Section 9.4(b) (2d Ed.2003).

Marceau, *Taking Voluntariness Seriously*, 54 B.C. L. Rev. 1545, 1545-46 ("[T]he 'voluntary act requirement' is a foundational component of criminal law. Courts, commentators, and theorists overwhelmingly assert that criminal law contains an act requirement. This surface consensus, however, belies the underlying reality of deep disagreement about the meaning, scope, and application of the act requirement in criminal law."); 1 Wayne R. LaFave, *Substantive Criminal Law*, Section 6.1(c) (2d Ed.2003).

{¶ 30} Indeed, courts have reached varying conclusions regarding this issue. *See State v. Hinkle*, 200 W.Va. 280, 286 (1996) ("[W]e hold that unconsciousness (or automatism) is not part of the insanity defense, but is a separate claim which may eliminate the voluntariness of the criminal act. Moreover, the burden of proof on this issue, once raised by the defense, remains on the State to prove that the act was voluntary beyond a reasonable doubt."); *State v. Deer*, 175 Wash.2d 725, 741 (2012) ("While a defendant must be allowed to argue that her actions were involuntary, thus excusing her from criminal liability, we hold that it is the defendant's burden to prove this defense by a preponderance of the evidence."); *Polston v. State*, 685 P.2d 1, 6 (Wyo.1984) (holding that "the burden is upon the defendant who raises the defense of automatism to prove the elements necessary to establish the defense; and the burden remains with the defendant throughout the trial"); *McClain v. State*, 678 N.E.2d 104, 107-09 (Ind.1997), quoting *Baird v. State*, 604 N.E.2d 1170, 1176 (Ind.1992) (" 'Once evidence in the record raises the issue of voluntariness, the state must prove the defendant acted voluntarily beyond a reasonable doubt.' * * * Automatism is simply a denial of one element—voluntary action—that the Legislature has required for most crimes."); *State v. Caddell*, 287 N.C. 266, 290 (1975) (holding that "unconsciousness, or automatism, is a complete defense to a criminal charge, separate and apart from the defense of insanity; that it is an affirmative defense; and that the burden rests upon the defendant to establish this defense, unless it arises out of the State's own evidence, to the satisfaction of the jury"); *State v. Weatherford*, 416 N.W.2d 47, 55 (S.D.1987) (finding that "the burden of proof rests on the State to prove the defendant was conscious at the time he committed the act, or acts, constituting the offense charged" and that the defendant had only the burden of producing evidence that would raise a reasonable doubt in the mind of the jury); *State v. Mishne*, 427 A.2d 450, 458 (Me.1981) ("The burden is on the state to prove that the

defendant was not acting in an unconscious, involuntary way."); *People v. Babbitt*, 45 Cal.3d 660, 693-94 (1988) (finding that "because consciousness is not an element of the offense of murder (nor of any offense), * * * there is no constitutional impediment to the state's use of a rebuttable presumption in meeting its assumed burden—once the issue has been raised—to prove consciousness beyond a reasonable doubt").[5]

{¶ 31} In Ohio, courts have historically characterized the defense of blackout or unconsciousness as an affirmative defense. *State v. LaFreniere*, 85 Ohio App.3d 840, 849 (11th Dist.1993), citing *State v. Myers*, 10th Dist. No. 6100 (July 14, 1959); *State v. Mobley*, 5th Dist. No. 2010-CA-0018, 2011-Ohio-309, ¶ 43; *State v. Hinton*, 8th Dist. No. 99581, 2014-Ohio-490, ¶ 27; *Hackedorn* at ¶ 42; *State v. Singleton*, 11th Dist. No. 2002-L-077, 2004-Ohio-1517, ¶ 36; and *State v. Robinson*, 2d Dist. No. 9547 (May 27, 1986).

{¶ 32} In *Myers*, the defendant was charged with "driving while under the influence of intoxicating liquor" after he drove his car through an intersection without stopping, resulting in a one-vehicle crash in which the passenger of his car was killed. *Id.* The defendant claimed he had no memory of going through the intersection and that "he must have gone to sleep." *Id.* On appeal, the state objected to the jury instruction on blackout because it failed to account for circumstances in which the loss of consciousness was induced by intoxication, and because it failed to place the burden on the defendant of proving the defense of blackout by a preponderance of the evidence. The court relied on *Lehman v. Haynam*, 164 Ohio St. 595 (1956), for the following proposition: "Where in an action for injuries arising from a collision of automobiles the defense of the defendant driver is that he was suddenly stricken by a period of unconsciousness, which rendered it impossible for him to control the car he was driving and which he had no reason to anticipate or foresee, the burden of proof as to such defense rests upon such driver." *Id.* at paragraph three of the syllabus. Although it noted that "the *Lehman* case was a civil

---

[5] Although not a state Supreme Court case, *People v. Nelson*, 2 N.E.3d 613, 619 (Ill.App.2013), appears to place the burden on the state to prove voluntary action with similar statutory language: "In addition to proving that the defendant performed the *actus reus* with the requisite *mens rea*, the State must also prove beyond a reasonable doubt that the defendant engaged in a voluntary act, for it is a 'fundamental principle that a person is not criminally responsible for an involuntary act.' *People v. Grant*, 71 Ill.2d 551, 558 (1978). Thus, the Criminal Code of 1961 provides that '[a] material element of every offense is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing.' 720 ILCS 5/4-1 (West 2010)." *See also Palmer v. State*, 379 P.3d 981 (Alaska App.2016), quoting *State v. Simpson*, 53 P.3d 165, 169 (Alaska App.2002) (finding that "although rarely disputed, the performance of a voluntary act 'remains an implicit element of all crimes' for which the State bears the burden of proof beyond a reasonable doubt").

action for damages," the court found that "in a criminal proceeding, the burden is upon the defendant to prove [that he was unconscious as] an affirmative defense." *Myers.*

{¶ 33} In *Robinson*, the court recognized the holding of *Myers* for the proposition that blackout was an affirmative defense. Further, the court stated that "the defense of blackout is very similar to the defense of insanity which also has been recognized as an affirmative defense since it is based on an excuse which is 'peculiarly within the knowledge of the accused' for which he can be fairly required to produce evidence." *Id.* Therefore, the court found that the defendant had the burden of proving blackout as an affirmative defense by a preponderance of the evidence pursuant to R.C. 2901.05(A).

{¶ 34} In *LaFreniere*, the court relied on *Myers* and *Robinson* to conclude that blackout was an affirmative defense. The court found that where the record contained "some credible, competent evidence supporting a finding of blackout * * * an instruction on the affirmative defense of blackout had to be given." *Id.* at 850, citing *State v. Payne*, 104 Ohio App. 410 (10th Dist.1957).

### 3. Analysis

{¶ 35} We begin our analysis by examining whether voluntariness is a requirement for establishing criminal liability. As previously stated, R.C. 2901.21(A) contains the basic requirements for criminal liability, providing in pertinent part that a "person is not guilty of an offense" unless that person commits "conduct that includes * * * a voluntary act."[6]

{¶ 36} In construing R.C. 2901.21(A), we must consider the General Assembly's intent when including the term "voluntary" in the statutory requirements for criminal liability. "The primary goal of statutory construction is to give effect to the intent of the legislature." *State v. Wilson*, 77 Ohio St.3d 334, 336 (1997), citing *Carter v. Youngstown*, 146 Ohio St. 203 (1946), paragraph one of the syllabus. "It is a basic tenet of statutory construction that 'the General Assembly is not presumed to do a vain or useless thing, and that when language is inserted in a statute it is inserted to accomplish some definite purpose.' " *Id.*, quoting *State ex rel. Cleveland Elec. Illum. Co. v. Euclid*, 169 Ohio St. 476, 479 (1959). Furthermore, "[a] court should give effect to the words actually employed in a statute, and should not delete words used, or insert words not used, in the guise of interpreting the statute." *State v. Taniguchi*, 74 Ohio St.3d 154, 156 (1995), citing *State v.*

---

[6] While we note that R.C. 2901.21(A)(1) also provides that "an omission" can satisfy the requirement of conduct sufficient to establish criminal liability, we limit our discussion to acts, as omissions are not relevant to our resolution of the instant matter.

*Waddell*, 71 Ohio St.3d 630, 631 (1995). *See State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545 (1996), citing *State ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 584 (1995) ("If the meaning of the statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary."). Following from these principles of statutory construction and consistent with the plain language of R.C. 2901.21(A), we find the General Assembly intended to require that an act be "voluntary" in order to establish criminal liability.

{¶ 37} Because, pursuant to R.C. 2901.21(A), criminal liability cannot be established without proof of conduct including a voluntary act, and we have found that the General Assembly intended to include the requirement that the act be voluntary, we conclude that voluntariness is an essential element of a criminal offense. *See Wilson* at 336, citing *MacDonald v. Bernard*, 1 Ohio St.3d 85, 89 (1982) ("In reviewing a statute, a court cannot pick out one sentence and disassociate it from the context, but must look to the four corners of the enactment to determine the intent of the enacting body."). Indeed, it has been recognized by some Ohio courts that actus reus is "[a]n essential element of every crime." *Mobley* at ¶ 36. *See also Hackedorn* at ¶ 35; *State v. Cloud*, 7th Dist. No. 98 CO 51, 2001-Ohio-3396; *State v. Brown*, 12th Dist. No. CA2008-12-049, 2009-Ohio-3933, ¶ 15, fn. 1.

{¶ 38} Thus, because a voluntary act is an essential element of the offense, the state constitutionally bears the burden of proving such element beyond a reasonable doubt. R.C. 2901.05(A); *Patterson* at 210 (finding "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged"); *Winship* at 364 (holding that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"). Some Ohio courts, including the Supreme Court of Ohio and this court, have stated that the burden rests with the state to prove that the accused engaged in a voluntary act. *State v. Nucklos*, 121 Ohio St.3d 332, 2009-Ohio-792, ¶ 6 ("In a criminal case, the state must prove that the accused engaged in a voluntary act * * * with the requisite degree of culpability for each element of the alleged offense in order to obtain a conviction. The state has the burden of establishing all material elements of a crime by proof beyond a reasonable doubt.") (Internal citations and quotations omitted.); *State v.*

*Ferguson*, 10th Dist. No. 07AP-999, 2008-Ohio-6677, ¶ 73, citing *State v. Squires*, 108 Ohio App.3d 716, 718 (2d Dist.1996) (finding that where an accused is charged with a strict liability crime, thus negating the mens rea requirement, "the prosecution need only prove that the offender engaged in a voluntary act or omission"). *See State v. Swiger*, 9th Dist. No. 26556, 2013-Ohio-3519, ¶ 17, quoting *State v. Colon*, 9th Dist. No. 91CA005003 (Mar. 25, 1992) ("The 'fundamental requirement' of the defendant having committed a voluntary act or omission 'is entirely separate and distinct from the element of "culpability" which must also be established for all non-strict liability crimes.' ").

{¶ 39} Therefore, having found that the state constitutionally bears the burden of proving beyond a reasonable doubt that the defendant engaged in a voluntary act, we cannot agree that the defendant must prove by a preponderance of the evidence that his or her actions were involuntary. Our review of *Myers*, *Robinson*, and *LaFreniere* does not compel a different conclusion. First, it is relevant that *Myers* was decided prior to the enactment in 1974 of R.C. 2901.21(A), which codified the requirements for actus reus and mens rea in order to establish criminal liability. Second, we find the reliance of *Myers* on *Lehman* to be unpersuasive, because *Lehman* was a civil action. Third, unlike in *Myers*, this case involves a claim of involuntariness arising from a PTSD-induced blackout, whereas *Myers* involved a claim of involuntariness arising from a voluntary action to drink alcohol ("defendant * * * engaged in drinking beer from early evening until after midnight"). *Id.* at 218. As a result, we cannot find that *Myers* is controlling over our analysis of the instant matter. Similarly, we find *Robinson* and *LaFreniere* to be unpersuasive because both cases rely on *Myers* in support of their holding, and do not support with analysis of R.C. 2901.21(A) the conclusion that blackout is an affirmative defense.

{¶ 40} Furthermore, we find that blackout resulting from PTSD is not "an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence." R.C. 2901.05(D)(1)(b). First, we find that the issue of voluntariness is not an excuse or justification. By disputing the voluntariness of his or her actions, the defendant is not admitting the elements of the crime but, nonetheless, seeking to escape the imposition of criminal liability. Instead, the defendant is disputing that the state met its burden of proof on an essential element of the

offense, i.e., the voluntary act. Therefore, the defense of blackout is not in the nature of an excuse or justification.

{¶ 41} Second, a defense challenging voluntariness does not involve evidence peculiarly within the knowledge of the accused. In most cases, the voluntariness of the defendant's actions is not an issue, as the presentation of evidence sufficient to prove the other elements of the crime is also sufficient to demonstrate that the defendant acted voluntarily. Thus, much like the defenses of alibi and mistake of fact, the defendant would necessarily have the burden of producing evidence sufficient to create a reasonable doubt as to the voluntariness of the defendant's actions. In response, the state is free to present its own evidence, including testimony from an expert witness, to carry its burden of proof that the defendant was acting voluntarily. Indeed, in the instant matter, the state subjected appellant's expert witness to cross-examination and presented testimony from its own expert witness relevant to the issue of the voluntariness of appellant's actions. Thus, we find that the defense of blackout does not involve evidence peculiarly within the knowledge of the accused.

{¶ 42} Here, the trial court instructed the jury that appellant bore the burden of establishing the defense of blackout, i.e. that appellant acted involuntarily, by a preponderance of the evidence as an affirmative defense. Because we have found that the state bears the burden of proving beyond a reasonable doubt that the defendant committed a voluntary act, we find that the trial court committed structural error. *Sullivan* at 281-82. Appellant's first assignment of error is sustained. As a result, we reverse appellant's conviction and remand this matter for further proceedings. Finally, we note that our holding in this case is limited to claims of involuntariness resulting from PTSD-induced blackout. *See* R.C. 2901.21(E)(2); OJI CR Section 417.07 (2016). Our holding does not implicate cases involving the voluntary intoxication of the defendant. *See* R.C. 2901.21(D).[7]

---

[7] We note that the defense of voluntary intoxication is governed by R.C. 2901.21(D), which provides: "Voluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense. Voluntary intoxication does not relieve a person of a duty to act if failure to act constitutes a criminal offense. Evidence that a person was voluntarily intoxicated may be admissible to show whether or not the person was physically capable of performing the act with which the person is charged."

**B.  Second, Third, Fourth, and Fifth Assignments of Error**

{¶ 43} In his second assignment of error, appellant asserts the prosecutor committed misconduct during closing argument, violating appellant's due process right to a fair trial.  In his third assignment of error, appellant asserts the cumulative effect of errors violated his due process right to a fair trial.  In his fourth assignment of error, appellant asserts the trial court erred by omitting the word "unconscious" in the jury instructions.  In his fifth assignment of error, appellant asserts the trial court erred by failing to give a curative instruction. Having sustained appellant's first assignment of error, appellant's remaining four assignments of error are rendered moot.

## IV.  Conclusion

{¶ 44} Having sustained appellant's first assignment of error and rendered moot appellant's remaining four assignments of error, we reverse the judgment of the Franklin County Court of Common Pleas and remand this matter for further proceedings consistent with law and this decision.

*Judgment reversed*
*and cause remanded.*

BRUNNER, J., concurs.
LUPER SCHUSTER, J., dissents.

————————————